William MOORE, et al., Plaintiffs,

v.

BLUE CROSS AND BLUE SHIELD OF THE NATIONAL CAPITAL AREA AND CAPITALCARE, INC., Defendants.

No. CIV.A. 94–1326.

United States District Court, District of Columbia.

Nov. 10, 1999.

Thomas Alvin Farrington, Harrington & Christian, Bowie, MD, Richard D. Carter, Carter & Coleman, Alexandria, VA, Martin H. Freeman, Freeman & Freeman, P.C., Rockville, MD, for plaintiffs.

Lloyd Nathaniel Fantroy, Foley & Lardner, Washington, DC, Charles J. Steele, Washington, DC, for defendants.

## DECISION & ORDER

JACKSON, District Judge.

This depressing parable of modern American medical care arose over seven years ago as a dispute over the medical benefits coverage afforded by an employee health plan governed by the Employee Retirement Income Security Act. ("ERISA"), 29 U.S.C. §§ 1001–1461 (1988). It ends, for the moment, in a disposition that pleases no one, including the Court.

Plaintiff William Moore and his wife Judith (the "Moores") bring this action on behalf of themselves and their dependent daughter, Alistaire, who was severely and permanently injured in an automobile accident in the fall of 1992. At all times relevant to this action Alistaire was a beneficiary of the ERISA plan (the "Plan"). The Plan contemplated both conventional indemnity pay-for-service medical insurance, and health maintenance organization-furnished ("HMO") medical treatment for beneficiaries, the former administered by defendant Blue Cross/Blue Shield of the National Capital Area ("Blue Cross/Blue Shield") and the latter by defendant Capi-

talCare, Inc. ("CapitalCare"), a Blue Cross/Blue Shield affiliate. The Plan itself was managed by CapitalCare.

While the controversy in this case spans several years and involves multiple coverage issues, in essence the Moores seek both a money judgment and a declaration that such benefits as have been paid to date for Alistaire's hospitalization and outpatient rehabilitation are chargeable to the CapitalCare HMO coverage rather than the indemnity component of the Plan. The purpose of the declaratory judgment is primarily to assure them of Alistaire's entitlement to a maximum of future benefits under the Plan, the indemnity-side coverage being both less comprehensive and subject to a lifetime cap. The money judgment would recoup expenditures the Moores have personally made or incurred for Alistaire's care that defendants have refused to pay under either coverage.

Defendants respond that the vast majority of the medical expenses for which claims have been submitted were properly paid under the indemnity component of the Plan, and as for the remaining unpaid claims, they are simply not covered benefits under either the HMO or indemnity coverage components. Defendants have also counter-claimed, asserting subrogation rights in a third-party tort recovery for Alistaire to the extent of the payments they have made for her care.

Upon the facts found as hereinafter set forth in accordance with Fed.R.Civ.P. 52(a) following trial without jury, and the conclusions of law drawn therefrom, for the reasons stated, the Court will enter declaratory judgment for plaintiffs, granting, in part, the relief prayed by their complaint. For the various reasons stated the Court concludes that the majority of claims submitted by plaintiffs should have been processed under the HMO component of the Plan, must be deemed covered benefits thereunder, and are enforceable in an ERISA proceeding. The Court, however, finds that most of the monetary recovery sought by plaintiffs is simply not available under ERISA. Additionally, the Court finds that defendants must prevail on their subrogation counter-claim.

## I.

In 1991 William and Judith Moore were the co-proprietors of a small video production and engineering firm in Washington, D.C., known as Techniarts. In the summer of 1991, Techniarts purchased group health benefit plan coverage (the "Plan") for its 10 employees (plus the Moores) and their dependents from Blue Cross/Blue Shield and its wholly owned subsidiary, CapitalCare, Inc. The contracts constituting the Plan consist of a pastiche of multiple parts, but the evidence establishes (and the parties are in substantial agreement) that the contracts are complementary, and in conjunction with one another afford the beneficiaries a species of coverage known as "dual-option." Pursuant to dual-option coverage, an insured can seek medical attention, at his or her election, either from the "HMO side," i.e., CapitalCare, and its network of health care plan "providers," or from the "indemnity side," i.e. Blue Cross/Blue Shield, which will pay, with significant limitations, the charges of non-network care givers treating in lieu of CapitalCare providers.

On September 10, 1992. Alistaire Moore, the 15–year–old intellectually gifted daughter of William and Judith, was a passenger in a chauffeured automobile rented by her parents to drive her back to school at Phillips Exeter Academy in New Hampshire. While passing through New York City, the driver lost control of the car, and Alistaire was critically injured in the crash that followed. She was transported by ambulance first to Bronx Memorial Hospital where she was found to have sustained massive trauma to her brain, and shortly thereafter transferred, in deep coma, to Montefiore Hospital where she remained for several weeks. On life support from her admission, Alistaire was not expected at either hospital to survive. Her mother and father watched at her

bedside day and night from hours after they were notified of the accident.

About four days into Alistaire's admission to Montefiore Hospital, William Moore took opportunity to notify Capital-Care of Alistaire's situation by pay phone from the hospital corridor. (CapitalCare was the Moore's contact point with the Plan.) The phone call went badly, and the relationship between the Moores and the Plan deteriorated still further over the ensuing months and years, ultimately culminating in this action.

After approximately two weeks at Montefiore Hospital, Alistaire's intracranial pressure dropped; she opened her eyes, and she gradually began to emerge from her coma. Specialized long-term inpatient therapy being indicated for Alistaire, the Moores made their own inquiries and discovered that the Kennedy Krieger Institute, affiliated with Johns Hopkins Medical Center in Baltimore, Maryland, was geographically the closest institution to the Washington, D.C. area with a comprehensive pediatric coma care capability. The Moores arranged for Alistaire's acceptance by Kennedy Krieger without getting unqualified express prior clearance from CapitalCare, but they notified CapitalCare about five days before her transfer and admission to Kennedy–Krieger on October 13, 1992.

Over the next six weeks at Kennedy Krieger, again attended closely by her parents, Alistaire began slowly to recover some cognitive and motor functions. By December 1st, the Moores were convinced that Alistaire would improve more rapidly at home, with intensive daily and day-long therapies of the types she was receiving sporadically at Kennedy Krieger, and they persuaded a somewhat reluctant Dr. James Christenson, the pediatrician-physiatrist supervising Alistaire's care at Kennedy Krieger, to discharge her to home. On December 1st, William Moore called CapitalCare to advise of Alistaire's impending discharge from Kennedy Krieger, and spoke for the first time to Barbara Mullin, who identified herself as Capital-Care's "case manager" for Alistaire's future care.

The substance of that conversation is disputed. Mr. Moore insists that Ms. Mullin readily acceded to home care for Alistaire, asserting that she could "approve" it immediately as less costly than Kennedy Krieger. Ms. Mullin denies that she approved anything, and asserts that she certainly did not commit CapitalCare (as opposed to Blue Cross/Blue Shield) to paying for the therapy regimen that the Moores were in the process of devising for Alistaire, largely on their own.

Alistaire's discharge from Kennedy Krieger on December 4, 1992, was preceded by a conference of Kennedy Krieger physicians and her parents at which the doctors again expressed their reservations. They nevertheless acceded to it with the understanding on their part that a "Dr. Helga Binder," a physiatrist reputed to be at Children's Hospital in Washington, D.C., would be engaged to direct Alistaire's therapy.

Deborah Goldberg, M.D., an internist in suburban Maryland and a CapitalCare in-network "provider," had previously been designated as the "HMO-side" Primary Care Physician for the Moore family. How and why she was selected is not shown by the record, but it is clear that Dr. Goldberg had seen Alistaire in person briefly for the first time, in September 1992, for a "sore throat" two days before she left for school. Her very next contact with Alistaire, as a patient, came in the form of a telephone call from Dr. Christenson at Kennedy Krieger to alert her to Alistaire's impending discharge and to impart to her information which he thought Dr. Goldberg should know about her history, current condition, and plans for future care. Dr. Christenson explained that Alistaire had sustained a "deep brain injury" and that she would require speech, physical, and occupational therapy, as well as "tutoring and re-education." He suggest-

ed that Dr. Helga Binder be the coordinating physiatrist, in conjunction with a neuropsychiatrist.

Dr. Goldberg did not actually see Alistaire until December 9th, and then only incidentally in the course of an office visit with her parents to discuss her care. The Moores had, by that time, made arrangements on their own for Alistaire's various therapies, no instructions to the contrary (or, indeed, of any sort) having been forthcoming from CapitalCare. The private physical, occupational, and speech therapists they had retained were available only an hour a day each, and for fewer than five days per week. The Moores understood the Kennedy Krieger home care protocol to call for two hours a day each of physical and occupational therapy, and so to fill the voids they hired a karate instructor and a strength-and-conditioning coach, respectively. To supplement the speech therapy the Moores employed a special education teacher, and they engaged several of Alistaire's own former academic instructors to revive or restore basic learning that she had lost.

None of these auxiliary "therapists" possessed a license as a healing arts practitioner as such, although all were licensed or certified in their respective disciplines.

According to the Moores, the names of all therapists, licensed and unlicensed, were furnished to both Barbara Mullin and Dr. Goldberg promptly as they were recruited for Alistaire. Barbara Mullin was noncommittal, but Dr. Goldberg was openly laudatory of the therapy regime the Moores had devised. No mention was made of Dr. Helga Binder —— indeed, she was never contacted by anyone ——nor did Dr. Goldberg propose any alternative referrals although asked about it by Mr. Moore.

The first intimation of a misunderstanding between the Moores and CapitalCare respecting the Plan's coverage for Alistaire's postKennedy Krieger care was manifested about the second week in December, 1992, when the agency furnishing 24–hour home nursing assistance declined to continue on the ground that its bills were not being paid. Mrs. Moore called Barbara Mullin on December 17th. The conversation was, once again, controversial, but in essence both Mrs. Moore and Ms. Mullin are in accord that Ms. Mullin informed Mrs. Moore that she had not "approved" the payment of bills for nursing assistance, nor any others. Ms. Mullin insists she tried to explain that the Moores' coverage, if any, would be on the "indemnity side" of the Plan, and bills would have to go through Blue Cross/Blue Shield, but Mrs. Moore wouldn't listen.

Over time, non-payment of the therapists' bills became a chronic problem. Whether the bills were being sent by the therapists to CapitalCare directly or forwarded through the Moores is not disclosed by the record, but neither "side" of the Plan was paying them. On January 15, 1993, Ms. Mullin instructed Mr. Moore to have all bills sent to her as she could "expedite their being sent over to the Claims Department to process." They were still not paid. In early February, 1993, Mr. Moore learned that Barbara Mullin had been replaced as a case manager by another woman. She, too, he found unhelpful, and he resolved to contact higher authority at CapitalCare.

Unable to reach him by telephone, Mr. Moore wrote to Dennis McIntyre, M.D., Vice President for Medical Affairs at CapitalCare on February 11, 1993. He summarized Alistaire's post-accident history, and argued the case for intensive in-home therapy as more effective and less costly than hospitalization. He asserted that CapitalCare's representatives had been "elusive or evasive," and concluded his letter with a demand that CapitalCare "pay for Alistaire's therapy in full and ... do so promptly." He did not, he said, "expect to have to act as a collection agent." He sent cc's to Dr. Goldberg, his lawyer, and a Maryland state insurance official. (Pl.Ex. 9).

Dr. McIntyre wrote back in kind on February 26th. He stated that "many of the therapeutic modalities" the Moores had arranged "were without CapitalCare's knowledge or authorization ... [and did] not qualify as covered benefits." In view of Mr. Moore's "particularly hostile comments" and his "refusal to accept the terms of [his] health insurance policy," Dr. McIntyre insisted their communications henceforth should be conducted through their respective attorneys. (Pl.Ex. 10). He, too, dispatched cc's intended to be intimidating, and sent the letter to Moore by fax and certified mail, return receipt requested.

Mr. Moore responded immediately —— by fax and Federal Express. He related in detail his discussions with Barbara Mullin, described Dr. McIntyre's assertion that Alistaire's various therapies were without CapitalCare's knowledge or authorization as "categorically untrue," and stated that CapitalCare's denial of coverage for them would be "neither timely nor made in good faith." He also intimated that the reinstitutionalization of Alistaire might be the only alternative if Capital-Care would not pay for the therapy she required at home. (Pl.Ex. 11).

According to Mr. Moore, Dr. McIntyre's letter of February 26th was his first notice from CapitalCare that it was denying all responsibility for the cost of Alistaire's home therapy. Dr. McIntyre never replied, or wrote or spoke to Mr. Moore again.

Until February of 1993, the Moores had essentially devised and directed Alistaire's therapy protocol on their own. By that time, however, their research had led them, to a Dr. Marc Cantillon, a Board-certified neuropsychiatrist with extensive academic and clinical experience in extended therapy for traumatic brain injury. The Moores sought a consultation with Dr. Cantillon, who was then affiliated with the University of Miami, and Dr. Cantillon's initial impression of Alistaire's therapy protocol had been favorable. After receiving Dr. McIntyre's letter of February 26th, the Moore's importuned Dr. Cantillon as an advocate to attempt to persuade CapitalCare to assume responsibility for her care. The Moores also understood by then that they "had to go back to Dr. Goldberg." If CapitalCare would not approve the protocol in effect, they needed to ask CapitalCare "to put in place a plan that [CapitalCare] would pay for."

On February 27, 1993, Mr. Moore wrote to Dr. Goldberg to schedule an appointment with her to seek her help. (Pl.Ex. 12) Dr. Goldberg had in fact seen Alistaire earlier in the month and once more assessed the Moores' therapy program as altogether acceptable from a medical standpoint. She met with Mr. Moore on March 3rd in response to his letter of the week before and reviewed the program again, including the names of all the therapists and care providers. (Pl.Ex. 7).

A month later, nothing having happened in the meantime, on March 23rd Mr. Moore wrote once more to Dr. Goldberg and Dr. Cantillon, beseeching them both to communicate with Dr. McIntyre. "CapitalCare has yet to pay single dollar of a single therapist's bills," he wrote, and several were threatening to quit. He asked them to advise Dr. McIntyre that the therapy had been effective, continued to be medically necessary, and its interruption would be "irresponsible." (Pl.Ex. 13).

Dr. Goldberg did not reply directly to Mr. Moore. Instead she sent a photocopy of Moore's letter to Dr. McIntyre with her own handwritten postscript stating that "clearly the parents have devised a program that is effective." She suggested that a meeting with the case manager might help to "work this out." [1] In her ensuing phone calls with Dr. McIntyre she

1. About the first of April, 1993, Blue Cross/ Blue Shield (not CapitalCare) began making payments to some of the therapists.

was told that the antipathy between CapitalCare and the Moores had escalated to the point at which effective communication had become impossible.

CapitalCare's response to the Moore's entreaties from all quarters was a phone call from its attorney. The attorney suggested that the Moores contact Georgetown University Hospital (a CapitalCare provider institution) as a possible source of the services Alistaire required, but disclaimed any responsibility on CapitalCare's part to coordinate her care. When he called Georgetown himself, Mr. Moore was told Georgetown was unwilling to accept Alistaire as an outpatient. On April 3, 1993, Mr. Moore wrote again to Dr. Goldberg formally requesting that she coordinate all care required by Alistaire "within the HMO component" of the Plan, as the indemnity side was paying only a "small fraction" of the cost of the program they had implemented. (Pl.Ex. 15). He enclosed a comprehensive description of the therapy Alistaire was then receiving, its frequency and cost, and asked to be told what the Plan would pay for and what the Moores would be expected to bear on their own. Having had no response by April 17th he wrote again. (Pl.Ex. 16).

Dr. Goldberg finally replied on April 26th. As to devising an alternative program under HMO-covered auspices, she was noncommittal. She recognized that some therapy was required, but now felt that the Kennedy Krieger prescription might have been excessive. She thought perhaps a psychiatrist might be helpful, but did not suggest how. She implied that Alistaire should be "transitioned" to a physiatrist—but recommended none —— and until that were done she simply proposed that *she* see Alistaire once a month in her office. (Pl.Ex. 17A).

Dr. Goldberg has never provided a written authorization form to any other health care provider —— in or out of the CapitalCare network —— for Alistaire's home care therapy.

After receiving the letter of April 26, 1993, the Moores never returned to Dr. Goldberg. They turned altogether to Dr. Cantillon who took over direction of Alistaire's therapy. They continued to submit the therapists' bills to Blue Cross/Blue Shield on the indemnity side of the Plan. Some were paid; others were not. They had no further direct communication with anyone at CapitalCare or Blue Cross/Blue Shield, or were ever offered (or authorized to implement) an alternative therapy regime to that of their own and Dr. Cantillon's devising under any conditions. In fact, the Plan never considered formulating one, and denied any obligation to do so, although aware of its medical necessity for Alistaire. (Defendants' admissions nos. 19, 21, and 34).

Alistaire was actually able to return to Phillips Exeter in the fall of 1993, and did so on the recommendation of Dr. Cantillon. In his opinion it was imperative that she begin the process of reintegration with a peer community and resume her academic pursuits. The alternative he foresaw for her was reinstitutionalization, and the opportunity lost forever for her to continue to improve. While at school, Alistaire's various therapy protocols were continued without interruption, and tutors were engaged to assist her in comprehending her academic work.

Although the record does not disclose precisely when it occurred, at least by November, 1997, Alistaire's therapy was being managed in all respects by a CapitalCare "in-network" provider, Dr. Steven Macado, a neurologist, presumably under the HMO-side coverage of the Plan. She is currently continuing to improve, but will nevertheless continue to need "neurocognitive rehabilitation" into the foreseeable future so long as she is improving. Without it, she is and will remain dysfunctional. She will also need psychological and psychopharmacological attention as time passes. Dr. James Lamott, a neuropsychologist who first saw Alistaire on referral from Dr. Macadco in November, 1997,

found her to have made "incredible progress—almost miraculous." He attributes it in "very large part" to the intensive therapy she had received since leaving Kennedy Krieger. She will continue to make progress, he believes, but will never fully recover normal adult faculties, much less her exceptional pre-accident abilities. She will require psychological care for the rest of her life, and is at increased risk for depression.

Lamott and Dr. Macado are both members of the Yater Medical Group, itself a CapitalCare network provider. In conjunction with one another—a neurologist and a neuropsychologist—they provide Alistaire today with all the cognitive therapy she requires.

## II.

Plaintiffs originally brought this action in the Superior Court of the District of Columbia against defendant CapitalCare alone,[2] asserting common law causes of action for breach of contract and promissory estoppel, and, alternatively, for relief pursuant to Section 1132(a)(1)(B) of ERISA, in the event that the state law claims were found to be preempted. CapitalCare promptly removed the case to this Court, alleging federal subject matter jurisdiction under 28 U.S.C. § 1331 and 29 U.S.C. § 1132(a)(1)(B). *SeeMetropolitan Life Insur. Co. v. Taylor*, 481 U.S. 58, 107 S.Ct. 1542, 95 L.Ed.2d 55 (1987).[3]

Plaintiffs' common law contract and promissory estoppel claims are preempted by ERISA because these claims "relate to [an] employee benefit plan," 29 U.S.C. § 1144(a), and are based upon common law of general application

that are not laws regulating insurance. *See Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 48, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987). Congress intended ERISA to provide a comprehensive and exclusive civil enforcement scheme that would protect the interests and contractually defined benefits of ERISA-plan participants and beneficiaries. *See Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 113, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). Congress also intended to relieve employers of the burden of accommodating diverse and conflicting state laws regulating the administration of employee benefit plans. *See Fort Halifax Packing Co., Inc. v. Coyne*, 482 U.S. 1, 8, 107 S.Ct. 2211, 96 L.Ed.2d 1 (1987).

ERISA's preemption clause, Section 514(a), 29 U.S.C. § 1144(a) (1994) preempts "any and all State laws insofar as they . . . relate to any employee benefit plan." The statute defines "[s]tate laws" to include "all laws, decisions, rules, regulations, or other state action having the effect of law." Section 514(c)(1) of ERISA, 29 U.S.C. § 1144(c)(1). The lower federal courts, mindful of the Supreme Court's pronouncements on the subject, have read this clause quite broadly. *See FMC Corp. v. Holliday*, 498 U.S. 52, 58, 111 S.Ct. 403, 112 L.Ed.2d 356 (1990); *Board of Trustees of the Hotel and Restaurant Employees Local 25 v. Madison Hotel, Inc.*, 97 F.3d 1479, 1486 (D.C.Cir. 1996).

The phrase 'relate to' in Section 514(a) of ERISA is also given an expansive reading. Congressional intent has been interpreted to mandate preemption of judicially created common law causes of action in

---

**2.** Blue Cross/Blue Shield was added as a voluntary party-defendant pursuant to Fed. R.Civ.P. 19.

**3.** The Court concurred at the time that this action was governed exclusively by ERISA, with the parties' rights and obligations determined exclusively by reference to the terms of the Plan, and, accordingly, denied plaintiffs' motion to remand and granted defendants'

motion to strike plaintiffs' jury demand. Plaintiffs subsequently filed a motion seeking reconsideration of the order denying remand. The Court adheres to its earlier ruling. *See Peterson v. American Life and Health Insur. Co.*, 48 F.3d 404 (9th Cir.1995). *But see* Memorandum & Order of April 7, 1999, (certifying issue for interlocutory appeal), *appeal denied* (D.C.Cir. July 2, 1999).

employee benefit plan contexts. *See New York Conference of Blue Cross & Blue Shield Plans v. Travelers Insur. Co.*, 514 U.S. 645, 658, 115 S.Ct. 1671, 131 L.Ed.2d 695 (1995) ("state laws providing alternative enforcement mechanisms ... relate to ERISA plans, triggering preemption"); *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987) ( state tortious breach of contract claim preempted because it interfered with ERISA's comprehensive regulation scheme). As the D.C. Circuit has succinctly explained, "even general common law causes of action, such as breach of contract, which were not specifically intended to apply to benefit plans covered by ERISA, will nonetheless be preempted insofar as they affect ERISA protected rights." *See Madison Hotel, Inc.*, 97 F.3d. at 1486–1487 (D.C.Cir.1996); *see also Psychiatric Institute of Washington D.C., Inc. v. Connecticut General Life Insur. Co.*, 780 F.Supp. 24, 28–29 (D.D.C.1992).

In this case, plaintiffs' state law contract claims (including promissory estoppel) do not merely "relate" to an employee benefit plan; they derive from and exist only by reason of the Plan. Accordingly, the claims made in the first three counts of plaintiffs' complaint are preempted. Moreover, as a suit by a beneficiary to recover benefits from a covered plan, this action must proceed directly under 29 U.S.C. § 1132(a)(1)(B), which provides an exclusive federal cause of action for the adjudication of such disputes. *See Metropolitan Life Insur. Co. v. Taylor*, 481 U.S. 58, 62, 107 S.Ct. 1542, 95 L.Ed.2d 55 (1987). A "participant or beneficiary" of a plan may bring a civil action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan ...." 29 U.S.C.A. § 1132(a)(1)(B).

The relief sought by plaintiffs falls into four categories. First, plaintiffs want the Court to adjudge and declare that all expenses incurred to date for Alistaire's post-accident therapy, irrespective of whether the therapist was an "in-network" CapitalCare provider, or an outsider, is chargeable to the HMO side of the Plan, i.e., against the CapitalCare coverage, rather than the indemnity side, i.e., Blue Cross/Blue Shield.[4] Second, the plaintiffs ask that the Court order CapitalCare to pay those expenses not yet paid by either CapitalCare or Blue Cross/Blue Shield. Third, they pray for a money judgment against CapitalCare reimbursing them for amounts they have personally expended for therapists and others not paid pursuant to the Plan, as well as for the value of care they personally rendered to Alistaire, and income they allegedly lost from employment as a result of the time they devoted to organizing and administering her therapy regime. Finally, plaintiffs seek a prospective declaratory judgment to the effect that CapitalCare must provide appropriate therapy for Alistaire in the future for the remainder of her life.

Defendants counter that all times relevant to this dispute, plaintiffs elected, in effect, to use their indemnity coverage, and that with respect to some $ 203,000.00 which Blue Cross/Blue Shield has already paid to multiple hospitals, physicians, and licensed therapists, there is no coverage dispute and the payment issue is moot. The remaining $38,000.00 in outstanding claims, defendants assert, were excluded services under the indemnity agreement, and properly denied. By way of counterclaim, defendants seek to enforce their right of subrogation for the amounts Blue Cross/Blue Shield has paid for Alistaire's care against the recovery from Alistaire's third-party tort claim.

---

**4.** The distinction is relevant for several reasons. At least at one time, indemnity side coverage for Alistaire was subject to a $1 million lifetime cap, as well as various deductibles. (Pl.Ex. 2, pp. 4–5) It also contains coverage limitations not found on the HMO side, e.g., 40 home health care visits per year (Def. Ex. 1A, p. M–HHC, 3 Article II.d.).

## III.

Were this a typical ERISA case, a preliminary issue to be addressed would be the standard by which the Court would measure the Plan's performance of its obligations as a fiduciary. As will hereafter be shown, however, this case is not altogether typical.

In *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 111, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989), the Supreme Court held that "a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." Courts clearly have the authority to construe the language of the contract *de novo* where the denial of benefits does not involve any discretionary authority on the part of the plan administrator. However, when a fiduciary exercises discretionary powers to deny benefits or construe the terms of a plan, a deferential standard of review must be employed. *Id; Germany v. Operating Engineers Trust Fund of Washington D.C.*, 789 F.Supp. 1165, 1167 (D.D.C.1992).

■ The D.C. Circuit has declared that there are no special words of art required to invoke the deferential standard of review; rather, the Court should focus on the character of the authority exercised by the administrator under the plan. It need only appear on the face of the plan documents that the fiduciary has been given the power to construe disputed or ambiguous terms or to resolve disputes over benefits eligibility. Therefore, language giving the administrator the power "to interpret or construe" the plan or "to make final and binding" decisions, triggers deferential review. *Block v. Pitney Bowes, Inc.*, 952 F.2d 1450, 1452–1454 (D.C.Cir.1992).

■ The dual-option Plan documents state that the administrator, i.e., CapitalCare, "has full discretionary authority to operate and administer the terms of [the] health benefits program ... determination(s) as to ... eligibility for coverage and/or benefits shall be final and binding, subject to your right of appeal ...." (Pl. Ex. 2, p. 55). Accordingly, a deferential standard of review is called for here, which is similar to the "arbitrary and capricious" test applied in the context of public administrative law. *See Block v. Pitney Bowes, Inc.*, 952 F.2d. at 1454. When applied to the fiduciary responsibilities of ERISA trustees, this standard requires a choice between reasonable alternatives, or a reasonable interpretation of the plan. *See Retirement and Sec. Program for Employees of Nat'l Rural Elec. Coop. Ass'n v. Oglethorpe Power Corp. Retirement Income Plan*, 712 F.Supp. 223, 226–227 (D.D.C.1989). However, "[i]t is for the trustees, not the courts, to chose between two reasonable alternatives." *Id.*, at 227 (quoting *Edwards v. Wilkes–Barre Publishing Co. Pension Trust*, 757 F.2d 52, 57 (3rd Cir.)), *cert. denied*, 474 U.S. 843, 106 S.Ct. 130, 88 L.Ed.2d 107 (1985). The courts may substitute their judgment for that of the trustee only if the trustee's actions are not grounded on any reasonable basis. *See Stewart v. Nat'l Shopmen Pension Fund*, 795 F.2d 1079, 1083 (D.C.Cir.1986); *Sheet Metal Workers' Int'l Assoc. v. Moore*, 990 F.Supp. 7, 9 (D.D.C. 1997).[5]

## IV.

For analytical purposes the Court will divide Alistaire's convalescence into four

---

**5.** The Supreme Court has observed, however, that "if a benefit plan gives discretion to a fiduciary who is operating under a conflict of interest, that conflict must be weighed as a factor in determining whether there is an abuse of discretion." *Firestone*, 489 U.S. at 115, 109 S.Ct. 948 (quoting Restatement (Second) of Trusts § 187 commented (1959)). Therefore, where, as here, the Plan administers itself (as CapitalCare does) by dispensing benefits it must also pay for, "that conflict must be weighed as a 'facto[r] in determining whether there is an abuse of discretion.' " *Bruch*, 489 U.S. at 115, 109 S.Ct. 948 (quoting Restatement (Second) of Trusts § 187, cmt. d (1959)); *see also Bernstein v. CapitalCare*, 70 F.3d 783, 787 (4th Cir.1995); *Brown*, 898 F.2d at 1566 (11th Cir.1990).

distinct phases: the first two involve her in-patient care, the latter two her post-discharge rehabilitation. Initially, the dispute in this case begins with coverage for Alistaire's hospitalizations, on an emergency basis, at the Jacobi Hospital and Montefiore Medical Center (the "New York Hospitals") immediately following the crash. Second is the coverage dispute involving her acute rehabilitative care as an in-patient at the Kennedy Krieger Institute in Baltimore, where she was transferred after she left New York and remained until released to begin a program of rehabilitative home care. Plaintiffs contend that they properly invoked their HMO coverage, and that the claims associated with the New York hospitalizations and Kennedy Krieger should have been processed under that component of the Plan. Defendants' position, as set forth earlier, is that there is no extant controversy with respect to those hospitalizations, because Blue Cross/Blue Shield has now paid both hospitals substantially in full, and the hospitals have made no additional claims against the Moores.

The remaining two phases of the dispute involve Alistaire's post-discharge care. The third phase involves Alistaire's rehabilitative care following her discharge from Kennedy Krieger on December 3, 1992, until late February, 1993, when an acrimonious exchange of correspondence between the Moores and CapitalCare revealed the extent of their disagreement. The fourth and final phase of the dispute began immediately thereafter when the positions of the parties were clearly known to one another. Plaintiffs argue that defendants are estopped to deny that Alistaire's medical care was covered under the HMO component from the time of her discharge from Kennedy Krieger on December 3, 1992, until late February, 1993, based on representations made or appearances created by CapitalCare as Plan administrator. Subsequent to that period, plaintiffs contend that the Plan was under an obligation to coordinate and provide benefits for an outpatient rehabilitation program for their

daughter covered under the HMO Agreement, a duty upon which CapitalCare defaulted in breach of the Agreement.

Defendants answer that by their conduct plaintiffs manifested an election to use their indemnity coverage under which neither defendant is obligated to coordinate any care, and only Blue Cross/Blue Shield must pay for any of it. This result follows because the Moores initially failed to properly pre-authorize in-hospital care for HMO coverage, and thereafter because they chose to implement their own program of care, rather than use Plan providers upon the prior written referral of their Primary Care Physician. Defendants contend that they paid all claims submitted in accordance with the provisions of the Indemnity Agreement, and that the small fraction of the claims denied payment altogether were properly rejected because the services were not provided by "licensed providers acting within the scope of their license."

Not fully in accord with the legal positions put forth by either party, but based upon evidence adduced at trial, the Court holds that the majority of the disputed claims submitted by the Moores were improperly denied under the HMO component of the Plan. For the reasons that follow, the Court finds that the claims submitted by plaintiffs for all of Alistaire's in-patient care, and for the majority of her post-discharge care until Alistaire returned to Phillips Exeter in the fall of 1993, should have been processed by CapitalCare under the HMO Agreement, and are covered benefits on that side of the Plan.

*The New York Hospitals*

 The coverage dispute begins with Alistaire's in-patient care. The first set of disputed claims involve Alistaire's emergency admissions to the Jacobi Hospital and the Montefiore Medical Center in New York City immediately following the accident. The Moores seek a determination that the expenses incurred for these hospi-

talizations are benefits under the HMO Agreement and should have been charged by CapitalCare to its side of the ledger, rather than to Blue Cross/Blue Shield. The Moores contest defendants' assertion that the HMO-indemnity distinction is irrelevant merely because the bills were paid.[6] The Court agrees that plaintiffs' right to relief is not moot merely because benefits were provided on the indemnity side of the dual-option plan.

The Benefits Booklet, explaining the interrelationship of the two agreements in the Plan, states that "[a]ll emergency claims will be considered for benefits first under the HMO component." (Pl.Ex. 2, p. 13). Because HMOs are managed care organizations which provide comprehensive health care to their members through a network of selected providers, a member's benefits are generally limited to a particular service area and to those providers who are under contract with the HMO. Exceptions are usually made, however, for emergency care received outside of the service area provided certain conditions are met, and the CapitalCare HMO Agreement contains just such provisions governing "out of area coverage," which apply "[i]f a member requires care while travel-

ing or temporarily residing outside of the Service Area [the Washington, D.C. metropolitan area]". Various preconditions demonstrating the need for coverage must of course be met when a medical emergency occurs outside of its Service Area. (Def. Ex.1A, at B–18).[7] CapitalCare does not dispute that Alistaire's hospitalizations in New York were on an emergency basis or that all of the conditions for coverage were met. CapitalCare instead invoked the following additional provision in the HMO Agreement to deny responsibility for its cost:

> The Member or a member of his or her family or other representative must notify CapitalCare prior to or as soon as possible after first receiving out-of-area care, but in any event within 24 hours. However, if the Member proves to the satisfaction of CapitalCare that it was not reasonably possible to give or have notice given within 24 hours, this requirement will be met if notice was given as soon as it was reasonably possible to do so, as determined by CapitalCare . . . . (Def.Ex. 1A, p. B–18).

Defendants now contend that the Moores did not notify CapitalCare of Alistaire's initial hospitalization within the first 24

---

**6.** To the extent that plaintiffs' argument is premised on the contention that the CapitalCare is the primary insurer and Blue Cross/Blue Shield was a secondary insurer under the coordination-of-benefits principles which apply when a person is insured by two separate policies, the Court rejects this contention as meritless. Plaintiffs entered into group contract which provided for both indemnity and HMO coverage Blue Cross/Blue Shield and CapitalCare, respectively. The interplay between the two species of coverage is governed by the Dual–Option Point-of Service Benefits Rider, (Def.Ex. 1A, p. DU/CPOS–1), and provisions of the Benefits Booklet consistent therewith, and not by coordination-of-benefits principles contained in the Plan.

**7.** Part H of the CapitalCare Agreement, entitled "Out of Area Coverage" provides, in relevant part:

> When a member receives care outside the Service Area, the following requirements must be met in order to receive benefits.

Benefits will be ... provided only if CapitalCare determines that:

a. The need for care could not reasonably have been foreseen before the member left the Service Area or sufficiently in advance so as to permit the Member to return to the Service Area for the care before it became urgent.

b. The condition required prompt medical attention in order to alleviate acute pain or prevent significant deterioration of the patient's condition.

c. The Member could not reasonably be expected to return to the Service Area to receive treatment from a Plan Physician or Plan Provider.

d. The travel was for some purpose other than the receipt of medical treatment.

e. The services were medically necessary, in the opinion of CapitalCare.

f. The charges were reasonable and do not exceed the lesser of the amount normally charged by the provider for similar services ...

hours of admission, and thereby rendered her ineligible for coverage under the HMO Agreement.

There is no evidence in this record, however, that CapitalCare has ever determined, prior to this lawsuit, whether it would have been "reasonably possible" for the Moores to do have given earlier notice, or that it would have made the slightest difference in the way her case was managed if they had.

The Moores' testimony at trial is compelling evidence that they notified Capital-Care as soon as *they* thought it was reasonably possible to do so. There is no evidence to the contrary. William Moore testified that upon receipt of a phone call from a New York State trooper informing him that his daughter had been gravely injured in an automobile accident, he made minimal arrangements for his other child in his parents' absence and flew directly to New York to meet his wife at Alistaire's bedside. (Tr. of 8/3/98, pp. 45–50). At Jacobi Hospital, the Moores were informed that Alistaire had a severe brain injury, was in a deep coma, and that her brain was increasingly edematous. (*Id.*, at 51). All but one of her doctors recommended at some point that the life support system keeping their daughter alive be discontinued. (*Id.*, at 62) Mr. Moore testified that he and his wife did not leave either Jacobi or Montefiore Hospitals, where their daughter remained in critical condition, for two weeks. (*Id.*, at 55). They participated in a 'round-the-clock vigil, assisting hospital staff in monitoring Alistaire's intracranial pressure and flow of medications to preserve whatever chance there was to save her life. (*Id.*, at 52).

Approximately four days into the hospital vigil, by his estimate, Mr. Moore found opportunity to notify CapitalCare of the hospitalization. (*Id.*, at 54). He was peremptorily told by the unidentified CapitalCare recipient of his call, without further inquiry, that his coverage would be restricted because he had not notified CapitalCare within 24 hours of Alistaire's admission. (*Id.*, at 55). Mr. Moore's attempts at further explanation to convey the nature of Alistaire's injury were dismissed. (*Id.* at 56)

The basis for CapitalCare's determination, if one was ever made, that notice was not given in a reasonable manner, is not in evidence.[8] Dr. McIntyre, the chief medical executive officer for CapitalCare, testified that he was unaware that HMO coverage for the N.Y. Hospital admissions had been denied on that basis. Similarly, Ms. Mullin, the CapitalCare case manager later assigned to Alistaire's case, testified that she had no personal knowledge why Alistaire's hospitalizations in New York were denied under the HMO Agreement. She speculated that it had to do with a failure of notification, but conceded that she did not know. Ms. Mullin explained that the case was not assigned to her until weeks after the accident, and by that point, the determination that the coverage would be under the indemnity line of business had already been made.[9]

Thus, this initial decision maker is unidentified, is shown to have had no knowledge of the grave circumstances surrounding Alistaire's condition upon admission to the New York hospitals, and obviously no reasoned basis for his or her decision. The uncontroverted evidence establishes to the Court's satisfaction *prima facie* that the Moores' notification of Alistaire's emergency hospitalization outside the CapitalCare Service Area was given as soon as reasonably possible, and that CapitalCare abdicated such discretionary authority as it had to make a contrary determination by

---

8. Although they requested it, the Moores were never granted an appeal on this issue. (Tr. of 8/4/98, p. 41).

9. Ms. Mullin explained that when a call comes in, the person answering the call is responsible for entering information into the CapitalCare computer system, and by the time Ms. Mullin received the computer printout for Alistaire's case, someone had already inserted the code for indemnity coverage into system.

declining to make any inquiry at all. As such, the determination apparently made to charge Alistaire's New York hospitalization expenses to the indemnity side of the Plan was arbitrary and capricious. All other conditions to their assumption by CapitalCare as out-of-service area HMO-covered charges having apparently been met, defendants will be required to alter their records and treat them accordingly for all purposes related to this case.

*The Kennedy Krieger Institute*

On October 13, 1992, Alistaire was transferred from the Montefiore Medical Center in New York City to the Kennedy Krieger Institute in Baltimore, M.D. where she received in-patient rehabilitative care. The Moores, asserting that these charges as well should have been processed and paid under the HMO Agreement as covered benefits, seek a determination that the Kennedy Krieger claims were improperly denied by CapitalCare, even if ultimately paid by Blue Cross/Blue Shield. Defendants contend that the claims were denied under the HMO Agreement because CapitalCare did not pre-authorize Alistaire's transfer to Kennedy Krieger.

Alistaire's admission to Kennedy Krieger was not an emergency admission; it was a planned transfer from an acute care hospital to a rehabilitation facility, albeit one chosen by the Moores. (Tr. of 8/11/98, p.m. session, p. 36). As such, defendants say, when a beneficiary goes from an inpatient stay to a planned admission elsewhere without any involvement on the part of the HMO, then the beneficiary is choosing to use the indemnity portion of the Plan. Plaintiffs do not dispute that the Kennedy Krieger admission was a planned admission; rather, they take issue with the assertion that CapitalCare was not involved in this transfer. The Moores contend that the Kennedy Krieger admission *was* specifically approved by CapitalCare

as a covered benefit under the HMO Agreement. (Tr. of 8/3/98, p. 59–60)

The evidence adduced at trial demonstrates that CapitalCare was very much involved in Alistaire's transfer to Kennedy Krieger. While Alistaire was still in Montefiore, the Moores began to look for a facility in the Washington, D.C., area that was equipped, and willing to take a pediatric patient in a Glasgow Level 4 coma. They found that there were very few places *in the country* that were willing to take a patient in Alistaire's condition. (Tr. of 8/11/98, p. 58). Mr. Moore contacted several hospitals, and was informed that the Kennedy Krieger Institute was the only facility in the Washington–Baltimore area with a pediatric comprehensive neuro-rehabilitation program. (Tr. of 8/3/98, p. 57–60). On October 8, 1992, five days before Alistaire was discharged from Montefiore, Mr. Moore called CapitalCare to inform them that there was no available facility in the HMO Service Area, and to seek pre-certification for the transfer to Kennedy Krieger. (*Id.* at 60). Mr. Moore testified that specific approval and pre-authorization for the treatment at Kennedy Krieger was orally granted by CapitalCare over the telephone. (*Id.*, at 60, 93)

It is unknown who Mr. Moore might have spoken with on October 8, 1992, and none of defendants' witnesses had any personal knowledge of that conversation; nonetheless, defendants claim that no such approval was granted. The evidence, however, supports a contrary conclusion. CapitalCare clearly played some role in the Kennedy Krieger admission. A "Case Review" printout, maintained by CapitalCare, contains clinical notes on Alistaire's care by a "RN & Precert Specialist." (Pl. Ex. 51). These notes reflect that a representative of Kennedy Krieger contacted CapitalCare on October 8, 1992, approximately 45 minutes after Mr. Moore had called.[10] (*Id.*). Other CapitalCare records

---

**10.** The Kennedy Krieger bills were initially rejected, at least in part, by both sides of the Plan, and Kennedy Krieger sought payment

from Mr. Moore. Apparently Blue Cross/Blue Shield paid the bills only after a representative of Kennedy Krieger provided supporting

also reflect that CapitalCare had specifically delineated transportation costs, as opposed to the other costs of care connected with Kennedy Krieger, as not covered benefits. The Case Review printout indicates that Mrs. Moore had been informed by CapitalCare that the HMO would not pay the costs of Alistaire's air ambulance transportation from New York to Baltimore, the implication being that it would be paying the other costs of care.[11] (*Id.*). Throughout Alistaire's stay at Kennedy Krieger, Ms. Mullin, the case manager for CapitalCare, was the contact point between Kennedy Krieger and the Plan. On October 20, 1992, Ms. Mullin indicated to the Kennedy Krieger Utilization Review department that theirs was a "covered coma program." (Tr. of 8/11/98, p.m. session, p. 25).[12]

While the Kennedy Krieger Institute, located as it is in Baltimore, is outside of the CapitalCare Service Area, and hence out of its provider network, this fact is not determinative of whether a benefit is covered under the HMO Agreement. Dr. McIntyre testified that "if no in-network providers were available, [CapitalCare's] policy was to allow the patient to go out-of-network, but receive benefits at an in-network level if it was some sort of service that was considered a covered benefit, medically necessary, and not available within our existing network, it was covered as an in-network benefit . . . with the qualifier that it was something that we would

work with the patient jointly to find a suitable provider who was outside the network." (Tr. of 8/11/98, p. 42). Mr. Moore testified that there was no other facility in the HMO Service Area that had this type of program, (Tr. of 8/3/98, p. 58), and that he discussed with CapitalCare the fact that Kennedy Krieger was the only hospital in the Baltimore–Washington region that was equipped and willing and to take an adolescent in Alistaire's condition. (Tr. of 8/30/98, p. 60). Dr. Christenson, director of rehabilitation at Kennedy Krieger, confirmed that Kennedy Krieger had the only pediatric brain injury program in the area in 1992 that could have provided appropriate care. (Dep. of 8/5/98, p. 9). The Moores and Kennedy Krieger both spoke with CapitalCare well in advance of the transfer. The hypothesis that another hospital might have been willing and able to provide similar services for Alistaire in October, 1992, was an issue that CapitalCare chose not to investigate (Tr. of 8/11/98 p.m., p. 32), and which is purely speculative at this juncture.

■ The burden rests on defendants to demonstrate that a specific policy exclusion applies to deny benefits. *See Horton v. Reliance Standard Life Insur. Co.*, 141 F.3d 1038, 1040 (11th Cir.1998); *McGee v. Equicor–Equitable HCA Corp.*, 953 F.2d 1192, 1205 (10th Cir.1992). They have not done so, and the Court finds from Mr. Moore's testimony and the circumstantial documentary evidence from both Kennedy

---

documentation to the Plan that the transfer had been authorized in advance of Alistaire's admission. (Tr. of 8/3/98, p. 93)

**11.** Blue Cross/Blue Shield paid for Alistaire's air ambulance transport under the Indemnity Agreement. Because the evidence indicates CapitalCare did contemporaneously reject responsibility for transportation expenses, and the HMO Agreement specifically excludes benefits for travel or transportation expenses, including travel required to return to the Service Area after the Member has received out-of-area emergency care, (Def.Ex. 1A, p. B–19), the Court will not disturb defendants' determination that this charge was properly processed under the Indemnity Agreement.

**12.** Ms. Mullin insists that she was acting on behalf of Blue Cross/Blue Shield with respect to the in-patient care, and asserts that she informed Kennedy Krieger that Alistaire's claims would be processed under the Indemnity Agreement. (Tr. of 8/11/98, p.m. session, p. 33). Ms. Mullin admitted, however, that she can not recall whether she specifically imparted this information to the Moores. (Tr. of 8/11/98, p.m. session, p. 76). Furthermore, the evidence reflects that even Kennedy Krieger was proceeding under the assumption that CapitalCare, and not Blue Cross/Blue Shield, was handing the cost of Alistaire's care. (Pl.Ex. 79, 80).

Krieger and CapitalCare that someone at CapitalCare with apparent authority to do so had given both the Moores and Kennedy Krieger to understand that Capital Care assumed responsibility for Alistaire as an HMO patient.

*Out–Patient Rehabilitative Care Prior to February 26, 1993*

■ The remaining two phases of this dispute involve Alistaire's post-discharge care. The third phase, therefore, involves Alistaire's rehabilitative care immediately following her discharge from Kennedy Krieger on December 4, 1992, until late February, 1993. The Moores again seek to charge the HMO Agreement with all expenses incurred for Alistaire's home care and therapy program from December 4, 1992, until February 26, 1993. Coverage was denied by CapitalCare on the HMO side, defendants explain, because plaintiffs chose their own providers and coordinated their own care, and thereby opted to proceed on the indemnity side of the Plan. Defendants thus processed all of the claims submitted for Alistaire's care on the indemnity side of the Plan, and Blue Cross/Blue Shield paid most of most claims submitted, with the exception of those submitted by six providers which were denied on the basis of policy limitations on that side of the Plan.[13]

The Moores seek to compel CapitalCare to charge these benefits on the HMO side of the Plan based upon a course of oral interpretations and representations made by their CapitalCare case manager, Ms. Mullin, and acquiescence by Dr. Goldberg, the Primary Care Physician, regarding the 'alternative care provision' in the HMO Agreement.[14] The Moores' position is that Ms. Mullin authorized them to implement a home health care program for Alistaire in lieu of continued hospitalization, and because they detrimentally relied on that interpretation and authorization, Capital-Care is estopped to deny its liability for the charges incurred for that care. The Court agrees.

■ An estoppel arises when one party has made a misleading representation to another party and the other party has reasonably relied to his detriment on that representation. *See Heckler v. Community Health Services of Crawford,* 467 U.S. 51, 59, 104 S.Ct. 2218, 81 L.Ed.2d 42 (1984). ERISA, of course, preempts plaintiffs' state law promissory estoppel claim, but preemption does not mean that all common law concepts are automatically inapplicable in an ERISA context. To the contrary, Congress expected that "a federal common law of rights and obligations under ERISA-regulated plans would develop." *Pilot Life Ins. Co. v. Dedeaux,* 481 U.S. 41, 56, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987). Federal courts have the authority to apply common law principles in order to deal with rights and obligations under ERISA that are not governed by the act itself. *See Firestone,* 489 U.S. at 110, 109 S.Ct. 948, *Pilot Life,* 481 U.S. at 56, 107

**13.** The claims submitted by AAA Warman Agency, Kim, Northeast, Couriet, Fitness, and Kingsbury have been denied on both sides of the Plan because they were not submitted by "licensed providers," acting within the scope of their respective licenses, a prerequisite for benefits, defendants assert, under the indemnity-side coverage of the Plan. Because the Court concludes, however, that defendants are estopped to deny that all of the claims submitted during this 13–week period are deemed benefits under the HMO Agreement, the asserted reasons for excluding the charges for these providers under the Indemnity Agreement are superfluous to the Court's review of this phase of the dispute.

**14.** The Court earlier dismissed the Moores' equitable estoppel claim for any charges incurred after February 26, 1993, at which time they were alerted, by way of letter from Dr. McIntyre that CapitalCare was denying any coverage for the home health care program then in effect. Any reliance on prior oral representations to the contrary would have been unreasonable after that date. *See* Order 7/24/98; *see also Variety Children's Hospital, Inc. v. Century Medical Health Plan, Inc.,* 57 F.3d 1040, 1043 (11th Cir.1995).

S.Ct. 1549; *see also Franchise Tax Board v. Construction Laborers Vacation Trust*, 463 U.S. 1, 24, n. 26, 103 S.Ct. 2841, 77 L.Ed.2d 420 (1983) (" '[A] body of Federal substantive law will be developed by the courts to deal with issues involving rights and obligations under private welfare and pension plans' ") (quoting 129 Cong. Rec. 299942 (1974)) (remarks of Sen. Javits); *Massachusetts Mutual Life Ins. v. Russell*, 473 U.S. 134, 156–157, 105 S.Ct. 3085, 87 L.Ed.2d 96 (1985) (Brennan, J., concurring) (ERISA's legislative history demonstrates that Congress intended federal courts to develop federal common law in fashioning additional appropriate relief).

Although the Moores' state law promissory estoppel claim as such may be preempted by ERISA, they have proved a state of facts working an estoppel as a matter of federal common law governing actions preempted but not specifically addressed by ERISA.[15] "[Beneficiaries] have a federal common law cause of action against insurers who have provided an oral interpretation of ambiguous ERISA plan provisions." *Psychiatric Institute of Washington D.C., Inc. v. Connecticut General Life Insur. Co.*, 780 F.Supp. 24, 31 (D.D.C.1992).[16]

■ A federal common law cause of action for estoppel under ERISA prevents both the detriment to the insured who relied on the misleading representation, and the unjust enrichment of the party to be estopped. *See Black v. TIC Investment Corp.*, 900 F.2d 112, 115 (7th Cir.1990). It also effectuates Congress's intent "to promote the interest of employees and their beneficiaries in employee benefit plans." *Psychiatric Institute*, 780 F.Supp. at 32, citing *Shaw*, 463 U.S. at 90, 103 S.Ct. 2890.[17]

■ The Court is mindful that estoppel cannot be used to enlarge or extend the coverage specified in an ERISA plan. However, when (1) the provisions of the plan are ambiguous, and (2) representations are made involving an oral interpretation of the ambiguous provision, application of the federal common law of equitable estoppel is appropriate.[18] *Kane*, 893 F.2d at 1285. Both of these initial criteria are met in this case.

First, an ambiguous provision is one about which "reasonable persons could disagree as to [its] meaning and effect." *Kane*, 893 F.2d at 1285. Plaintiffs contend that when the provisions of the HMO

---

**15.** Once it is determined that the state law claims are preempted, the Court may recharacterize the state law claims as ones arising under ERISA. *See Psychiatric Institute of Washington D.C. v. Connecticut General Life Ins. Co.*, 780 F.Supp. 24 (D.D.C.1992); *Murphy v. Wal–Mart*, 928 F.Supp. at 707

**16.** The majority of the circuits having addressed the issue, have approved, at least under certain circumstances, the use of estoppel in ERISA. *See, e.g. Kane v. Aetna Life Insur.*, 893 F.2d 1283 (11th Cir.1990) (allowing estoppel in the context of an interpretation of ambiguous policy provision); *Black v. TIC Investment Corp.*, 900 F.2d 112 (7th Cir.1990)(recognized at least in the context of single-employer unfunded welfare benefit plans); *Haeberle v. Board of Trustees*, 624 F.2d 1132 (2nd Cir.1980); *Greany v. Western Farm Bureau Life Ins.*, 973 F.2d 812, 821 (9th Cir.1992) (adopting the 11th Circuit's approach); *Slice v. Sons of Norway*, 34 F.3d 630 (8th Cir.1994)(requiring an ambiguity).

**17.** Defendants have pointed out, in the pre-trial litigation of this issue, that *Psychiatric Institute* involved promissory estoppel rather than equitable estoppel. Although the doctrines are distinct, *see Morris v. Runyon*, 870 F.Supp. 362, 372, n. 21 (D.D.C.1994), the court in *Psychiatric Institute* actually referred to both doctrines, and any distinction between the two doctrines is not significant for purposes of whether estoppel principles are appropriately part of the federal common law applicable to ERISA actions.

**18.** When these conditions are met, a potential conflict with 29 U.S.C. § 1102(a)(1), requiring that benefit plans must be maintained pursuant to a written instrument, is eliminated. An oral interpretation of an ambiguous plan provision does not modify or extend coverage which is not otherwise conferred by the written instrument. *See Kane*, 893 F.2d at 1284; *compare Nachwalter v. Christie*, 805 F.2d 956 (11th Cir.1986).

Agreement providing for Home Health Care benefits and for Out–Patient Medical Services, are read in light of the Plan's authority to authorize alternative care, an ambiguity arises. The 'alternative care' provision upon which plaintiffs specifically rely, reads:

> Case Management is a service which helps to identify any potentially long-term cases. We will review your case to determine if your existing health care benefits are sufficient. If special benefits are required, we may recommend alternative levels of care such as extended care facilitates, home health care, . . . or outpatient services. (*Id.*, at 52).

The Benefits Booklet indicates that the purpose of this provision is to "reduce costs by encouraging treatment that is necessary, appropriate, and in the patient's best interests." (Pl.Ex. 2, p. 51). This 'alternative care' provision which, by its nature, requires interpretation and authorization by the Plan, in itself creates no contractual duty, but it is one about which reasonable persons could disagree as to its meaning and effect.

Second, the evidence adduced at trial indicates that Ms. Mullin, CapitalCare's acknowledged spokesperson, interpreted the extent of the Moores' entitlement to benefits under this ambiguous provision when she evinced approval —— as she did —— of a home health care program for Alistaire which she knew contemplated the use of non-CapitalCare providers, and Dr. Goldberg, the Primary Care Physician, repeatedly reinforced the impression that she had sanctioned the program without reservation.

As Dr. McIntyre acknowledged, Capital-Care's case management personnel must be involved in a traumatic brain injury

case like Alistaire's in order for benefits to be provided. (Tr. of 8/11/98, a.m. session, p. 54). In late 1992 and early 1993, Capital Care's practice in traumatic brain injury cases was to coordinate care through the nurse case managers, in consultation with Dr. McIntyre, both before and after the patient was discharged from the hospital, (Tr of 8/11/98, a.m. session, p. 36). Ms. Mullin's job was to work with patients with respect to care that was alternative to institutionalization, (Tr. of 8/11 p.m. session, p. 55), and her daily duties involved reviewing and pre-authorizing medical care for alternative and outpatient settings.[19] (Tr. of 8/11/98, p.m. session, p. 66). Dr. McIntyre, having admitted that Alistaire was a "long term case" within the meaning of the 'alternative care provision', (Tr. of 8/11/98, a.m. session, p. 37), explained that this provision allowed CapitalCare to recommend "in lieu of hospitalization, choosing a less expensive and more efficacious alternative approach to the problem." (Tr. of 8/11/98, a.m. session, p. 40).

The evidence reflects and the Court finds that Mr. Moore called Ms. Mullin in early December, 1992, to inquire whether he had home health benefits under his HMO coverage. (Tr. of 8/3/98, p. 63 ) (Pl.Ex. 5). After presenting the situation and explaining what the Kennedy Krieger home health care prescriptions would entail, Ms. Mullin told him that as an alternative to a continued in-patient stay, "CapitalCare would pay for a six-hour-a-day home-therapy program to treat Alistaire's brain injury and that CapitalCare was not going to look at the individual elements inside of that program, but treat it as a comprehensive program—as a group program."[20] (Tr. of 8/3/98, p.168). Mr.

---

**19.** Ms. Mullin's job with respect to alternative care was to receive requests for such services, determine if benefits existed, decide if the services were medically necessary, find in-network providers or go to out-of network providers if necessary, give the proper referrals, and coordinate the alternative care. (Tr. of 8/11/98, a.m. session, p. 55)(Tr. of 8/11/98, p.m. session, p. 66).

**20.** The Kennedy Krieger prescriptions for Alistaire home health care program written at the time of discharge specifically indicated that Alistaire needed: physical therapy for two hours a day, five days per week; speech therapy, including continued work on Alistaire's language skills, for two hours per day, five days per week; occupational therapy for

Moore and Ms. Mullin did a rough calculation of the cost of the proposed alternative on the phone (Tr. of 8/3/98, p. 128), and Ms. Mullin volunteered that her approval was based on the fact that the home health care program would result in significant cost savings [over the continued hospitalization] for the Plan.[21] (Tr. of 8/3/98, p. 68).

Ms. Mullin instructed Mr. Moore to get in contact with providers in the Washington area, and use his Primary Care Physician, Dr. Goldberg, as a resource in order to implement this care. Mr. Moore had begun some research, and with Ms. Mullin's concurrence, contacted medical providers in the area, and began to schedule therapists so that they would be in place upon Alistaire's discharge. (Tr. of 8/3/98, p. 70). At Ms. Mullin's request Moore sent the names and telephone numbers of the therapists and other providers to her. (Tr. of 8/3/98, p. 70) (Tr 8/11/98, p.m. session, p. 79), and kept Ms. Mullin aware of Alistaire's providers. (Tr. of 8/3/98, p. 89). Moore explained to her that it was impossible to obtain only licensed physical, occupational, and speech therapists for two hours each per day, and he had therefore turned to adjunct professionals to fulfill the Kennedy Krieger prescriptions. (Tr. of 8/3/98, p. 76–79, 168).

While Capital Care denies generally that Ms. Mullin's words and deeds constituted definitive representations of a determination to afford HMO-side coverage for Alis-

taire's post-discharge course of home therapy (Tr. of 8/11/98, p.m. session, p. 80), the record is replete with evidence to the contrary. On December 2, 1992, two days before discharge, Ms. Mullin's case management notes indicate that she was "called by Mr. Moore about home health care benefits for daughter in lieu of inpatient rehab at Kennedy Krieger." In an entry the following day, she wrote that she had spoken with officials at Kennedy Krieger and requested a fax copy of the team conference and the recommendations. (Pl Ex 5). On December 4, a separate worksheet she maintained indicates that the family was planning to take Alistaire home, and that she "spoke with father and asked him to get primary care physician and follow up doctor here -[Father] will call back info." (Pl.Ex. 77) (Tr. of 8/11/98, p.m. session, p. 30). Ms. Mullin admitted that she requested the Moores provide her with information about Alistaire's therapists, and her case management notes record her knowledge of the identity of Alistaire's physical, occupational, and speech therapists, strength and conditioning trainers, karate instructors, educational tutors, and 24–hour home health aid care. (Pl Ex. 5, p. 4). A December 8, 1992 entry in her chart confirms the need for 24–hour home health aid care.[22]

Kennedy Krieger phoned and faxed the information about the home health pro-

---

two hours per day, five days per week; and live-in nursing assistance to provide 24 hour supervision. A few weeks subsequent to discharge, the Kennedy Krieger doctors wrote a prescription approving karate as a form of physical therapy. (Dep. of 8/5/98, pp. 31–34)(Pl.Ex. 4). The Kennedy Krieger records indicate that these prescriptions were faxed to Ms. Mullin (Pl.Ex. ); CapitalCare denies that they were ever received. (Pl. 1st Req. for Admis., No. 37)

21. CapitalCare admitted that it was aware that discharging Alistaire from Kennedy Krieger into home health care would be less expensive care. (Pl. 1st Req. for Admis., No. 31). The cost-effectiveness of the home health care program was confirmed by a cost-

benefit analysis performed by CapitalCare which determined a cost avoidance of $18,-930.00 for the period of 12/7/92 to 12/31/92 if Alistaire received alternative care. (Pl. 3rd Req. for Admis. 18, 20)(Tr. of 8/11/98, p.m. session, p. 79)(Pl.Ex. 50, p.27).

22. The records produced at trial demonstrate that Ms. Mullin's notes on Alistaire's case consisted of a sheet entitled "assessment/plan/goals; a sheet entitled 'CapitalCare Utilization Management Worksheet'" described by her as the worksheet she used to make notes connected with the in-patient care and the follow-up care plan, (Tr of 8/11/98, p.m. session, p. 18), and approximately seven pages with chronological entries captioned "Case Management Care Plan."

gram and its prescriptions to Ms. Mullin prior to Alistaire's discharge.[23] (Pl.Ex. 80). A Kennedy Krieger case report, dated December 23, 1992, describing Alistaire's discharge, records that a clinical supervisor at Kennedy Krieger made a "call to Mullin, case manager for Alistaire from Capital Care. Information was faxed to her to assist mom and dad find the appropriate professionals so that they may continue Alistaire's rehabilitation at home." (Pl.Ex. 80)(Tr. of 8/11/98, p.m. session, p. 74).

As Ms. Mullin had instructed, Alistaire's Primary Care Physician, Dr. Goldberg was also made fully aware of the Moores' plans. (Tr. of 8/4/98, p. 129). The Moores took Alistaire to see Dr. Goldberg within days of her discharge to discuss the home therapy program which they had designed. She endorsed it without reservation, making a list of Alistaire's providers for her own office chart. (Tr. of 8/3/98, p. 75) (Pl.Ex. 7). Dr. Goldberg applauded Alistaire's course of care every time the Moores inquired, remarking that it was medically effective and working. (Tr. of 8/4/98, p. 128) Additionally, Ms. Mullin and Dr. Goldberg were updated throughout the period with the most current list of therapists, including the intensities and durations of Alistaire's various therapy sessions. (Tr. of 8/3/98, p. 79)(Tr. of 8/4/98, p. 43) (Pl.Ex. 52). In fact, Ms. Mullin and Dr. Goldberg were in contact with one another as late as February 12, 1993, discussing Alistaire's continued medical need for care. (Pl.Ex. 5, p. 5). Dr. Goldberg confirmed that it was her understanding that Ms. Mullin was processing the bills for payment and overseeing coordination of the care for the HMO. (Tr of 8/11/98, a.m. session, p. 68).

When Mr. Moore expressed concern about the slow payment of bills, Ms. Mullin told Mr. Moore to be patient because she was "putting overrides" in the system to make sure that the payments were made. (Tr. of 8/3/98, p. 92). She requested, as confirmed by an entry in her case management chart dated January 15, 1993, that Mr. Moore send all invoices for outpatient services to her attention so that she could expedite this process. ( Pl.Ex. 5). In addition, she personally contacted some of Alistaire's auxiliary therapists to instruct them regarding payment. (Pl.Ex. 60).[24]

While Ms. Mullin does not dispute that she assured Mr. Moore that there would be benefits under the Plan, she denies that she made a specific commitment in the December 3, 1992, phone call as to which side of the Plan would be paying the bills. This, however, is a moot point. Mr. Moore understood at all times that he was speaking to the CapitalCare case manager for outpatient and alternative care options for the HMO side of the Plan. He could and did reasonably believe that Mrs. Mullin was confirming the home therapy program under the HMO Agreement.

Perhaps most telling of all, however, is the ineluctable fact that pre-approval of care is completely unnecessary on the Indemnity side of the Plan. The nature of the Dual–Option Plan is that, while HMO coverage requires approvals in advance and "case management;" on the indemnity side of the Plan the insured picks the provider without consulting the Plan. As Ms. Mullin testified, if Mr. Moore had wished to proceed under the Indemnity Agreement, no pre-authorizations would ever have been necessary. She simply would not have

23. Mr. Moore repeatedly asserts that copies of the Kennedy Krieger physicians handwritten prescriptions were transmitted to CapitalCare before Alistaire's discharge. (Pl.Ex. 13) (Pl. Ex. 4). CapitalCare denies receiving them. (Pl. 1st Req. for Admis., No. 37)

24. For example, Anne Roberts of Kim Studio testified that Ms. Mullin would contact her to

inquire how Alistaire's therapy was progressing and that Ms. Mullin personally explained how she should go about submitting bills to get payment from CapitalCare. (Tr. of 8/4/98, p. 149–150)(Pl.Ex. 60). Kathy Jones, Alistaire's special education tutor, was also contacted by Ms. Mullin in December, 1992. (Tr. of 8/7/98, p. 36).

been involved. (Tr. of 8/11/98, p.m. session, p. 74).

Much is made by defendants over a December 17, 1992 telephone exchange between *Mrs.* Moore and Ms. Mullin, the true import of which is far from clear. (Tr. of 8/3/98, pp. 164–167, 176)(Tr. of 8/4/98, pp. 93–96). Defendants assert that this conversation must surely have put the Moores on notice that HMO-side authorization for the therapy plan was very much in doubt. The Court, however, draws no such conclusion. The evidence reflects that the conversation was in regard to disputed payments to a single provider. Because Ms. Mullin found communication with Mrs. Moore ineffectual, she spoke with Mr. Moore about the same matter later that afternoon. Ms. Mullin, however, can not specifically recall whether she alerted him to a general coverage controversy, (Tr. of 8/11/98, p.m. session, p. 94), and Mr. Moore is unequivocal that she did not, instead assuring him that she was "setting up the HMO account" to get these providers paid. (Tr. of 8/3/98, p. 178). Some three to four weeks later, Ms. Mullin instructed Mr. Moore to arrange to submit all claims directly to her so that she could prevent any further payment delays.[25]

■ The elements of an equitable estoppel, are: (1) the party to be estopped misrepresented material facts; (2) the party to be estopped had actual or constructive knowledge of the true facts; (3) the party to be estopped intended that the misrepresentation be acted upon or had reason to believe that the party asserting estoppel would rely on it; (4) the party asserting the estoppel did not know, nor should have known, the true facts; and (5) the party asserting the estoppel reasonably and detrimentally relied on the mis-

representation. *See Heckler v. Community Health Services of Crawford,* 467 U.S. 51, 59, 104 S.Ct. 2218, 81 L.Ed.2d 42 (1984), *National Companies Health Benefit Plan v. St. Joseph's Hospital,* 929 F.2d 1558, 1572 (11th Cir.1991), *Perpetual Building Limited Partnership v. District of Columbia,* 618 F.Supp. 603, 613 (D.D.C. 1985); *Cassidy v. Owen,* 533 A.2d 253, 254–255 (D.C.1987). The evidence as found by the Court at trial demonstrates that plaintiffs have satisfied each element necessary to prevail on this theory prior to late February, 1993.

While the Court does not find that Ms. Mullin actually intended to deceive the Moores as to the source of coverage under the Plan for Alistaire's post-discharge therapy, "it is not essential to the creation of an equitable estoppel . . . that the party sought to be estopped should have had an actual intent to deceive, defraud, or mislead. Nor is it essential that the representation or conduct relied upon be motivated by actual malice." *Cassidy v. Owen,* 533 A.2d at 255, citing, 28 AM.JUR 2d. Estoppel & Waiver § 41, at 648 (1966) (footnotes omitted).

But if, in fact, anyone in authority at CapitalCare had determined, in December, 1992, that the Plan would pay for Alistaire's care only under the Indemnity Agreement, it was incumbent upon someone at CapitalCare—Ms. Mullin, Dr. Goldberg, or Dr. McIntyre — to have informed the Moores before they had engaged the services of the various physical therapists, occupational therapists, speech therapists, cognitive tutors, nursing assistants, (including the "unlicensed" adjuncts) in order to develop a therapy program.[26] Indeed, in explicating the scope

25. Ms. Mullin's explanation for requesting Mr. Moore to direct all invoices to her attention was the following: "I was only trying to assist Mr. Moore, he was having problems getting his claims paid and I was trying to assist him expedite his claims; I was just trying to funnel them and assist him, so that he wouldn't have to make an extra phone call,

I was only trying to do customer service." (Tr of 8/11/98, p.m. session, p. 80).

26. Mr. Moore testified that he specifically asked Ms. Mullin for the names of head-injury therapists within the CapitalCare network, and Ms. Mullin indicated that she could not provide him with any names. (Tr. of 8/3/98,

of an ERISA fiduciary's responsibility to disclose material information to its beneficiaries, the D.C. Circuit has made the following observation: "Refraining from imparting misinformation is only part of the fiduciary's duty. Once [the plaintiff] presented his predicament, [the fiduciary] was required to do more than simply not misinform, [it] also had an affirmative obligation to inform— to provide complete and correct material information on [plaintiff's] status and options." *Eddy v. Colonial Life Ins. Co. of America*, 919 F.2d 747, 751 (D.C.Cir.1990).

The Court concludes that CapitalCare is estopped to deny HMO-side coverage under the Plan for all expenses incurred by the Moores for Alistaire's therapy following her discharge from Kennedy Krieger, including those to whom Blue Cross/Blue Shield later denied payment on the indemnity side on the ground they were "unlicensed."

*Rehabilitative Care after February 26, 1993*

As previously related, Mr. Moore attempted to establish contact by telephone with Dr. McIntyre directly in early February, 1993, without success. On February 11th he wrote to Dr. McIntyre demanding that CapitalCare acknowledge a responsibility to pay Alistaire's therapy expenses "in a prompt and efficient manner." (Pl. Ex. 9). Dr. McIntyre's letter in reply two weeks later on February 26th dispelled any notion that Capital Care believed it had assumed or would henceforth assume any responsibility for the therapy regime then in place. (Pl.Ex. 10). Mr. Moore replied in kind the same day (Pl.Ex. 11). The exchange of correspondence contributed nothing conducive to agreement upon the extent of Alistaire's HMO coverage with Capital Care.

Unable to get specific information from anyone else at CapitalCare as to exactly what therapists or type of care would be covered, (Pl.Ex. 9, 11, 14) (Tr. of 8/3/98, p. 121), the Moores reapproached their Primary Care Physician, Dr. Goldberg. The Moores were now convinced that they needed a written referral from Dr. Goldberg to obtain any further HMO-covered care for Alistaire, and that Dr. Goldberg must ultimately be responsible for coordinating Alistaire's therapy under the HMO (Tr. of 8/3/98, pp. 73, 96, 118), although she had shown little interest before. The Moore's implored Dr. Goldberg to set up a program that would meet CapitalCare's criteria. On April 3, 1993, Mr. Moore wrote Dr. Goldberg requesting that she coordinate all of Alistaire's health care requirements and medical needs on the HMO side of the Plan. (Pl.Ex. 15). Specifically, Mr. Moore stated:

I am requesting that you and Capital-Care now develop a comprehensive plan for Alistaire's continuing treatment. I request that the plan be in writing and be specific as to providers, treatments, milestones, and goals for each of her conditions .... I would like the plan to be developed under three scenarios [pertaining to varying levels of involvement by the Moores]. I will need to see costs under each scenario including an exact accounting of what will be paid for under the HMO, what will be paid for under the indemnity, and what CapitalCare and BCBS expects me to fund. I would like to see this plan by the end of the week. (*Id.*, p. 2,3).

Two weeks passed with no response to his letter from Dr. Goldberg or anyone else. Mr. Moore wrote again to Dr. Goldberg on April 17, 1993, essentially reiterating his requests that either she or another physician at CapitalCare respond. (Pl.Ex. 16). The only formal response that the Moores ever received from a CapitalCare physician was a letter from Dr. Goldberg, dated April 26, 1993. (Pl.Ex. 17). In it she explained that she had spoken with Ms.

---

p. 70). Ms. Mullin disputes that such a conversation took place. The Court views resolution of this specific factual dispute unneces-

sary in light of Ms. Mullin's and Dr. Goldberg's tacit approval of the providers actually utilized. (Def.Ex. 14).

Mullin, and they both agreed that Alistaire continued to need extensive speech, physical, and occupational therapy. Dr. Goldberg then inexplicably questioned the necessity of all of the Kennedy Krieger post-discharge prescriptions for Alistaire's care, but she proposed no deviation, offered no alternative plan of her own or any other physician's devising, and suggested not a single specialist by name by whom Alistaire should be seen, other than herself once a month.

No one at CapitalCare—not Dr. Goldberg, Dr. McIntyre, or Ms. Mullin—ever undertook to develop and coordinate any rehabilitative care for Alistaire Moore. (Req. for Adm. No. 34).

The Moores turned to Dr. Cantillon for help, and he ultimately took over *de facto* responsibility in late April or early May 1993, once CapitalCare's abdication of any responsibility for coordinating and supervising Alistaire's care had become clear. (Tr. of 8/3/98, pp. 80, 192) (Tr. of 8/4/98, p. 14). He merely continued with the Moore's program, principally because it was obviously working, although he adapted it to meet Alistaire's changing needs from time to time. (Tr. of 8/3/98, p. 120)(Tr. of 8/5/98, p. 33–35). CapitalCare declined to respond to Dr. Cantillon's overtures. (Tr. of 8/5, pp.24–27). Ultimately, he just sent reports. (Pl.Ex. 24). No one connected with CapitalCare ever indicated that any written authorization or referral would be forthcoming. (Tr. of 8/3/98, p. 120). Bills were intermittently paid, usually from indemnity-side coverage. Some simply remain unpaid. (Def.Ex. 7).

### V.

The Moores contend that Capital-Care was at all times under a contractual obligation to coordinate and provide benefits for Alistaire's out-patient rehabilitation under the HMO Agreement utilizing "Plan physicians or providers", a duty the

Moores assert that CapitalCare utterly ignored. Plaintiffs refer to both the Home Health Services provision and the Out-Patient Medical Services provision of the HMO Agreement for the source of the obligation. The HMO Home Health Services Provision upon which plaintiffs rely reads:

1.) *Covered Home Health Services.* The home health services listed below are available within the Service Area ... when requested by the Member's Primary Care Physician or other Plan Physician to whom the Member has been duly referred ...

b.) Short term physical therapy for conditions which, in the judgment of CapitalCare, are subject to significant improvement within a period of 90 days.

c.) Part-time or intermittent home health aide services. (Def.Ex. 1A, p. B–8)

The pertinent HMO Outpatient Medical Benefits provision reads:

1.) *Covered Outpatient Medical Services.* Members are entitled to benefits for the covered services listed below when provided by Plan Physicians in accordance with the requirements of this Agreement. Written referral by the Member's Primary Care Physician is required prior to obtaining the services of other Plan Physicians and Plan Providers.

a.) Medical services and surgery, including care and consultations by Plan Physician specialists.

b.) Diagnostic procedures, laboratory tests and x-ray services by Capital-Care-designated Plan Providers ...

j) Short term rehabilitation services and physical therapy (for conditions which CapitalCare determines are subject to significant improvement within a period of 90 days). (Def.Ex. 1A, p. B–2).[27]

**27.** Dr. McIntyre explained that these provisions do not limit benefits to a period of 90

days. The policy would afford coverage indefinitely so long as the Primary Care Physi-

CapitalCare now denies coverage under the HMO Agreement for the bulk of Alistaire's rehabilitative care from the beginning, asserting simply that, in initiating their own therapy regime using non-Plan providers and without receiving the prior written referral of their Primary Care Physician, the Moores had opted to use their Indemnity coverage, under which the Plan has no management responsibilities at all. Coverage under the Home Health Service provision fails, defendants say, because the services were not requested by the "CapitalCare Primary Care Physician or other Plan Physician to whom [Alistaire] has been duly referred." (Def.Ex. 1A, p. B–8). Coverage under the Out–Patient Medical Services requires that services be "provided by Plan Physicians or Providers" upon the "[prior] written referral by the Member's Primary Care Physician" (Def.Ex. 1A, p. B–2). Reiterating this referral requirement, the exclusions and limitations section of the HMO Agreement explains:

> Except in the event of an In–Area Emergency or Out of Area services … benefits will not be provided for service(s) provided by non-Plan Physicians or Providers, unless prior written authorization is specifically given to the Member by the Primary Care Physician to obtain specified services from such physician or provider. *Verbal or informal referral to or subsequent approval of the Member's use of non-Plan Physicians and Providers by a Primary Care Physician or other Plan Physician does not confer eligibility for coverage under this Agreement.* (Def. Ex. 1A, Part I, p B–20) (emphasis added).

cian makes a predetermination every 90 days that additional treatment would result in substantial improvement of the patient's condition during the next ensuing 90 days.

**28.** Dr. McIntyre, whose job it was to "make interpretations of the benefit packages" on both the HMO and indemnity sides of the Plan (as well as "medical necessity" determinations) (Tr. of 8/11/98, pp. 25–26), conceded

On the unique facts of this case, the Court concludes defendants' reliance on these exclusions as a basis for denying the Moores' claims under the HMO Agreement is misplaced. It is undisputed that Alistaire was entitled to precisely the sort of care and therapy she had been receiving. Its medical necessity (leaving aside the matter of "unlicensed" therapists) was and is conceded. At least two provisions of the HMO Agreement expressly offer it as a benefit within the ambit of the HMO coverage, using the services of Plan physicians and providers.[28] After February 26th it was expressly and formally requested by the insureds — indeed, through the Plan-specified channel by which it was to be obtained, i.e., the Primary Care Physician. CapitalCare never offered it, nor did it offer the written authorization from the Primary Care Physician to enable the Moores to procure it, as an HMO-side benefit, from non-Plan physicians and providers. In the circumstances, the written referral CapitalCare insists is a condition precedent to HMO-side coverage is a condition solely within the power of the Plan to fulfill.

Defendants' position, as noted, is that because the Moores had commenced Alistaire's therapy using their own self-selected providers, they had thereby automatically elected the indemnity-side coverage of the Plan, relieving CapitalCare of any obligation to coordinate — or pay for — any of Alistaire's therapy or rehabilitative care. As defense counsel explained, "in the absence of a request by the Moores, coupled with a willingness on their part to use CapitalCare providers, the contract imposes no such obligation on Capital-

he was aware that Alistaire would need a "significant amount of rehabilitative services," whether in or out of the hospital. (*Id.*, p. 36). Those services could be provided "in-network," i.e. on the HMO side, either by CapitalCare's contract providers or, if no appropriate providers were to be found in-network, by outsiders acceptable to both patient and CapitalCare at in-network levels.

Care" to coordinate any care. (Tr. of 8/4/98, p. 56).

The Court finds that the Moores made no such "election." To the contrary, the Moores' repeated entreaties were clear in calling upon CapitalCare to assume responsibility, and they never evinced an unwillingness to use any Plan provider. None was ever proposed to them. Nonetheless, neither Dr. Goldberg, nor anyone else at CapitalCare, has ever given the Moores a single written referral to any doctor or therapist, in-, or out-ofnetwork, for Alistaire's rehabilitative care, (Tr. of 8/3/98, p. 115)(Tr. of 8/10/98, p. 89), much less offered a coordinated, comprehensive treatment program for Alistaire comparable to the obviously effective program of the Moores' own devising.

Inexplicably, Dr. Goldberg may have been unaware that her failure to so do would work a forfeiture of Alistaire's coverage under the HMO Agreement. (Tr. of 8/10/98, p. 87). Although Dr. Goldberg admitted, and CapitalCare has never questioned, that continued therapy was medically necessary for Alistaire, Dr. Goldberg affirmed that she has never filled out a form for any doctor to coordinate Alistaire's care, nor for any physical, occupational, or speech therapist, nor for any adjunct service provider. (Tr. of 8/3/98, p. 114) (Tr. of 8/10/98, p. 86).

Dr. Cantillon explained that there is a "window" of time after a traumatic brain injury, from six months to two years, during which treatment is most effective. If the victim does not receive the maximum and most effective treatment available during her "window," it is likely that the opportunity for optimum recovery will be lost. (Tr. of 8/5/98, p. 29).

If Dr. Goldberg did not comprehend what either the Moores or CapitalCare expected of her, CapitalCare must ultimately accept this risk. As Dr. McIntyre explained, setting up a treatment regime was the responsibility of the Primary Care Physician. (Tr. of 8/11/98, a.m. session, p. 76). Where an HMO delegates such an important responsibility to a Primary Care Physician, and then knowingly declines to insist that she discharge it, the company will have to accept the risk of the consequences, which, in this case, is a finding by this Court that the Plan was in breach of its contract to provide appropriate post-discharge benefits under the HMO Agreement. *See McGee v. Equicor–Equitable HCA Corp.*, 953 F.2d 1192, 1198, 1204 (10th Cir.1992).

## VI.

Blue Cross/Blue Shield has since paid many of the bills submitted by the therapists engaged by the Moores under the indemnity-side coverage of the Plan. To the extent the Moores wish to have those payments charged against the HMO-side of the Plan for accounting purposes, possibly increasing the amount of any lifetime coverage remaining available to Alistaire, they are entitled to an order to that effect.

Some of the auxiliary therapists, i.e., those not possessing "licenses" in the healing arts from state regulatory authorities, have never been paid, or were paid by the Moores from their own funds. At trial, Dr. McIntyre explained the process by which he made "medical necessity" determinations for the Plan in deciding who would be paid. As an initial matter, whether a provider held a healing arts license was determinative of the patient's need for that provider's care. (Tr. of 8/11/98, p. 66). As he explained it, the possession of a license "was [his] first cut" at whether a provider's services were medically necessary for an insured; in other words, if a therapist held a healing arts license, the therapy must have been "medically necessary." (*Id.*, pp. 66–67).

The Court finds that the denial of coverage solely on the basis of the absence of a healing arts license in the field of service rendered is an arbitrary and unreasonable distinction on the part of the administrator of the Plan. "Medical necessity" connotes a clinical rather than a reg-

ulatory concept. *See e.g. McLaughlin v. Connecticut General Life Insur.*, 565 F.Supp. 434 (N.D.Cal.1983). "Medically necessary" care implies that the care is to some degree needed and beneficial to the patient. The fact that a provider of service is not licensed by a particular medical board or organization, or that the discipline itself is governmentally unregulated, does not automatically mean that a treatment is not of value to the patient. *See id.*, at 451; (Pl.Ex. 25).

Dr. McIntyre never contested the medical necessity of Alistaire's continued care in general. He acknowledged that he knew Alistaire definitely needed extended rehabilitation, either as an institutional inpatient or by way of alternative therapies in a residential setting. (Tr. of 8/11/98, p. 36). He conceded that he himself had no formal education, training, or prior experience with respect to the rehabilitative treatment of a brain injury. In making his determinations with respect to Alistaire's care, he reviewed no literature on the treatment of brain injury, spoke with none of Alistaire's treating physicians or providers, either at Kennedy Krieger or those engaged by the Moores after her discharge. He reviewed none of the therapists' voluminous reports detailing Alistaire's care and progress, and refused to speak with either the Moores, or those doctors who the Moores persuaded to contact him to discuss Alistaire's medical needs on their behalf. (Tr. of 8/11/98, pp. 21, 50); (Pl. 1st Req. for Admis. 2, 3).

Furthermore, purely as a contractual matter, defendants have not pointed the Court to any provision in the HMO Agreement that even arguably requires the possession of a license by a caregiver as a prerequisite to coverage, and the Court's own review has revealed no such language. Dr. McIntyre suggested that the requirement of a license might be found in CapitalCare's literature respecting eligibility for admission to the CapitalCare provider network. (Tr. of 8/11/98, p. 67). Possibly

so, but it would not bind an insured Plan beneficiary.

Therefore, the Court holds that the CapitalCare's denial of coverage for the claims by so-called "unlicensed" therapists—karate instructors, strength and conditioning coaches, tutors, and the like—submitted for Alistaire's rehabilitative care were improperly denied based on the coverage limitation upon which defendants rely. Having found that the defendants' denial of the Moores' claims under the HMO Agreement was unreasonable, the Moores are entitled to have all claims submitted and paid by Blue Cross/Blue Shield treated as having been processed and paid pursuant to the HMO Agreement.

To summarize the holdings of Parts IV and V, the claims submitted in connection with Alistaire's inpatient care in New York between September 10, 1992, and October 13, 1992 are to be charged to CapitalCare under the HMO component of the Dual–Option Plan. All claims submitted in connection with Alistaire's in-patient care at the Kennedy Krieger Institute are likewise deemed benefits under the HMO component of the Dual–Option Plan, and must be paid by CapitalCare. CapitalCare is estopped to deny that the claims submitted from December 4, 1992, through February 26, 1993, in connection with Alistaire's home therapy program are covered benefits under the HMO component of the dual-option Plan. And all claims submitted in connection with Alistaire's rehabilitative care from February 26, 1993 until Alistaire's return to school in the fall, are awarded as benefits payable by the Plan for its breach of the HMO Agreement and chargeable against CapitalCare.

The Court finds the record unclear as to the period between the fall of 1993 and the inception of Alistaire's in-network care by CapitalCare providers Drs. Macado and Lamott in the fall of 1997. It is its intention to award as benefits owing under the HMO Agreement all charges for services of a kind and nature such as those received from December, 1992, until September,

1993. It is *not* its intention to award, as benefits payable *on either side of the Plan,* such items as Alistaire's tuition at Phillip's Exeter Academy, i.e., expenditures the Moores would likely have made for their daughter's well-being had she never been injured. Absent agreement by the parties, further proceedings may be necessary.

## VI.

Aside from the accounting adjustments and payments required by reason of the Court's rulings with respect to HMO vs. indemnity coverage in Parts IV and V, plaintiffs pray for an award of consequential damages and declaratory relief as to future benefits they calculate to be in excess of $1.2 million. This sum represents income which plaintiffs have allegedly lost while caring for Alistaire, the value of the services they have themselves provided to Alistaire, and the costs which will be associated with Alistaire's rehabilitative care for the rest of her life. Defendants respond that the damages sought by plaintiffs constitute extra-contractual relief not otherwise recoverable under ERISA, and that the requested declaratory relief is simply too speculative at this time. The Court agrees. Much of the relief which plaintiffs seek constitutes "consequential damages," if they can be so described, or expenditures that were never contemplated within the ambit of the Plan coverage on either "side." Plaintiffs' monetary recovery will be limited to the amount of certain of the claims improperly denied by the Plan altogether which were then paid by the Moores, and the declaratory relief confined to a reallocation of claims properly chargeable to Capital Care but paid by Blue Cross/Blue Shield.

▮ The relief available to plaintiffs in this case is ultimately limited to the remedy afforded by ERISA's civil enforcement scheme. Under the civil enforcement provisions of § 502(a), a plan participant or beneficiary can bring a civil action to recover benefits due to him under the terms of the plan, to enforce his rights under the terms of the plan, or to clarify rights to future benefits. 29 U.S.C. § 1132(a) (1988); *see Pilot Life Insur. Co. v. Dedeaux,* 481 U.S. 41, 53, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987). Relief may take the form of accrued benefits due, a declaratory judgment on entitlement to benefits, or an injunction against a plan administrator's improper refusal to pay benefits. *Id.* Congress clearly expressed an intent that "the civil enforcement provisions of ERISA § 502(a) be the exclusive vehicle for actions by ERISA plan participants and beneficiaries asserting improprieties in the dispensation of benefits." *Pilot Life Insur. Co. v. Dedeaux,* 481 U.S. 41, 52, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987). "[T]he detailed provisions of § 502(a) set forth a comprehensive civil enforcement scheme that represents a careful balancing of the need for prompt and fair claims settlement procedures against the public interest in encouraging the formation of employee benefit plans." *Id.* at 54, 107 S.Ct. 1549.

Most courts having addressed the scope of the relief specifically available under section 502(a)(1)(B), have started with the Supreme Court's statement in *Massachusetts Mutual Life Insur. Co. v. Russell* 473 U.S. 134, 105 S.Ct. 3085, 87 L.Ed.2d 96 (1985):

> [s]ignificantly, the statutory provision explicitly authorizing a beneficiary to bring an action to enforce his rights under the plan— § 502(a)(1)(B) ...— says nothing about the recovery of extracontractual damages, or about the possible consequences of delay in the plan administrators' processing of a disputed claim. Thus, there really is nothing at all in the statutory text to support the conclusion that such a delay gives rise to a private right of action for compensatory or punitive relief. *Id.* at 144, 105 S.Ct. 3085.

Several circuits have found that statement sufficiently definite to conclude that there is no private right of action by an ERISA plan beneficiary for extra-contractual compensatory or punitive damages un-

der § 502(a)(1)(B). *See Harsch v. Eisenberg*, 956 F.2d 651 (7th Cir.1992)[29]; *see also Medina v. Anthem Life Ins. Co.*, 983 F.2d 29 (5th Cir.1993); *Reinking v. Philadelphia American Life Insur. Co.*, 910 F.2d 1210 (4th Cir.1990); *McRae v. Seafarers' Welfare Plan*, 920 F.2d 819, 821 n. 7 (11th Cir.1991).

## VII.

■ According to defendants' calculations, Alistaire has received benefits totaling approximately $203,000 from either Blue Cross/Blue Shield or CapitalCare, and the Plan seeks to recover these expenditures by way of a counter-claim to enforce a right of subrogation. The source to which they are looking for payment is the $1.3 million which Alistaire received in settlement of her negligence claim against the driver of the vehicle in which she was injured and the driver's various insurers.

As an initial matter, plaintiffs argue that no right of subrogation exists with respect to payments made by the Plan, because none of Alistaire's claims were paid by CapitalCare.[30] Plaintiffs also assert, assuming that a subrogation claim does lie, that the interpretation of the subrogation provision by the Plan as applicable to the facts of this case is arbitrary and capricious, relying on the fact that Alistaire's third-party tort recovery has not made her whole. Finally, plaintiffs contend that subrogation is barred by an anti-subrogation statute found in the Virginia Code. Finding that the Plan has paid substantial sums on Alistaire's behalf from one "side" or the other of the Plan, and that the Indemnity Agreement contains a valid and enforceable subrogation provision, the

Court concludes, defendants will prevail on their counter-claim.

The Dual–Option Plan contains the following subrogation provision under Article XII—Miscellaneous Provisions:

12. Subrogation . . . .

a. To the extent that benefits for covered services are provided or paid under this Contract, the Corporation shall be subrogated and succeed to any rights of recovery of a Participant for expenses incurred against any persons or organizations except insurers on policies of health insurance issued to and in the name of the Participant.

b. The Participant shall pay the Corporation all amounts recovered by suit, settlement, or otherwise from any third party or his insurer to the extent of the benefits provided by this Contract.

c. Attorneys's fees, court costs, and any other costs expended in the course of securing recovery by suit, settlement, or otherwise, shall be subtracted from the amount to be paid to the Corporation; the amount to be subtracted shall be as follows:

(1) If the case is settled out of court—one-quarter of the amount of benefits paid or to be paid for covered services; or

(2) If the case is settled as a result of litigation—one third of the amount of benefits paid or to be paid for the covered services. (Def. Ex. 1A, p. XII.3 –4).

Plaintiffs point to the following language contained in the Benefits Booklet which explains the concept of subrogation by the Plan in the following way:

---

**29.** Extra-contractual damages are those that are distinct from the "benefits to which plaintiff is contractually entitled to" under the "terms of the Plan." *See Harsch*, 956 F.2d at 655–656.

**30.** The subrogation claim was initially filed by Capital Care when it was a sole defendant. Blue Cross/Blue Shield was subsequently add-

ed as a defendant for all purposes, including the counter-claim.

Pursuant to the Dual–Option Plan, the subrogation provision of the indemnity component of the Plan supersedes and replaces all such provisions, if any, contained within the CapitalCare HMO Agreement. (Def. Ex. 1A, Capital Choice Dual Option Point–of–Service Benefits Rider, ¶ 3).

To Prevent Duplicate Payments (i.e., Subrogation)

If you are injured as a result of someone else's negligence or wrong-doing, the Plan has the legal right to recover benefits payment for medical care related to your injury. This right is now as subrogation. The Plan "subrogates" or substitutes for you, thereby pursuing your right to seek recovery from the negligent party. Subrogation thus helps to keep your subscription rates from rising unnecessarily because the Plan will not be charged for the cost of care that is rightfully someone else's responsibility. (Pl.Ex. 2, p. 50).

Relying on this language, plaintiffs assert that because the purpose behind the subrogation provision is "to prevent duplicate payments, " no subrogation can lie, because the amount recovered from the liability insurance coverage available to the third-party tortfeasor was only a small fraction of the full value of Alistaire's claim. In short, she has received nothing amounting to a "duplicate payment," considering the magnitude of her injury.

The uncontradicted evidence at trial demonstrated that the total recovery obtained by way of the tort claim was substantially less than the full fair value of Alistaire's claim. Paul Beckman, the Moores' personal injury attorney, testifying as an expert as to the fair value of Alistaire's personal injury claim, asserted that its full and fair value, had insurance coverage for the tortfeasor been adequate, was approximately $6 million. (Tr. of 8/5/98, p. 11). After deductions for attorneys' fees and costs, Alistaire realized approximately $900,000 to $1 million, less than one-sixth of the fair value of the claim. (Tr. of 8/5/98, p.12).

■ However, the fact that Alistaire's recovery may not have made her whole, will not in itself defeat the Plan's application of the subrogation provision in this case. The principles of review applicable to an ERISA plan enunciated by the Supreme Court in *Firestone* are applicable

not only to benefit determinations, but also to assertions of purported reimbursement and subrogation rights by the Plan. *See Walker v. Wal–Mart Stores, Inc.*, 159 F.3d 938, 939 (5th Cir.1998). The operative language of the Benefits Booklet is unambiguous and clear — "the Plan has the legal right to recover benefits payments for medical care related to your injury" — and the Plan's interpretation of its subrogation rights under these provisions has not been demonstrated to be unreasonable in any way — unfair, perhaps, but not unreasonable.

■ The Plan provisions, when read in context, can only mean that the Plan is entitled to be reimbursed by the beneficiary all amounts that the Plan has paid to the beneficiary, or on her behalf, to the full extent that the beneficiary recovers from another source. *See Sunbeam–Oster Company, Inc. Group Benefits Plan for Salaried and Non–Bargaining Hourly Employees v. Whitehurst*, 102 F.3d 1368, 1371 (5th Cir.1996). The language that the Plan "shall succeed to any rights of recovery" and the participant shall pay "all amounts recovered" to the Plan plainly means the first dollar of recovery and 100% recovery of the funds received by settlement, up to the full amount of the benefits paid. *See Walker* 159 F.3d at 939. There is no implicit requirement that the Plan take into account the settling parties' allocation of the proceeds in a tort settlement to items other than medical care. An ERISA plan participant can not unilaterally allocate settlement proceeds to something other than medical expenses in order to evade subrogation or to buttress an argument that a double recovery would not have resulted. *Chitkin v. Lincoln Nat'l Insur., Co.*, 879 F.Supp. 841 (S.D.Cal.1995).

Finally, plaintiffs argue that defendants are barred to assert subrogation in this case based on a provision of the Virginia code. The Virginia Code section upon

which plaintiffs rely reads, in pertinent part:

No insurance contract providing hospital, medical, surgical and similar or related benefits, and no subscription contract or health services plan delivered or issued for delivery or providing for payment of benefits to or on the behalf of persons residing in or employed in this Commonwealth shall contain any provision providing for subrogation of any person's right to recovery for personal injuries from a third person. Va.Code § 38–3405.

By its terms, this statute has bearing only where the contract or plan: 1) is delivered or issued for delivery in Virginia; 2) provides for the payment of benefits for persons residing in Virginia; or 3) provides for the payment of benefits for persons employed in Virginia. It is not alleged that plaintiffs reside or are employed in Virginia. Plaintiffs argue, however, that the CapitalCare Agreement was issued for delivery in Virginia, and thereby, subrogation is barred. Assuming without deciding whether the Virginia statute was preempted by ERISA, *see Shaw v. Delta Air Lines,* 463 U.S. 85, 97–99, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983), it is clear that this statute is simply not applicable to the facts of this case. The Plan was created by the contract, known as the "Group Contract," between Techniarts and Group Hospitalization and Medical Services, Inc. ("GHMSI") a division of which is Blue Cross and Blue Shield of the National Capital Area ("BCBSNCA") and CapitalCare, Inc., a subsidiary of BCBSNCA. The front page of the Group Contract bears the name Blue Cross and Blue Shield of the National Capital Area, and indicates that the Group Contract was issued by BCBSNCA, a division of GHMSI, hereinafter referred to as the Corporation, to Techniarts. The front page of the Group Contract states unequivocally that the "the Corporation has caused this Contract to be signed at Washington, D.C."

It is, therefore, this 10th day of November, 1999,

ORDERED, that the parties shall have judgment, as their interests appear, in accordance with the foregoing; and it is

FURTHER ORDERED, that counsel for the parties shall appear at a status conference on December 3, 1999 at 9:30 a.m. for the purpose of settling on the terms and form(s) of official judgment(s) to be entered herein, and to schedule such further proceedings as may be required for the same.